IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BLUEFIELD DIVISION

CHRISTY L. CORDELL,                    )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )        CIVIL ACTION NO. 1:06-00920
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
            Defendant.                 )

M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-

1383f. This case is presently pending before the Court on the parties' cross-Motions for Judgment

on the Pleadings (Doc. Nos. 13 and 16.). Both parties have consented in writing to a decision by the

United States Magistrate Judge. (Doc. Nos. 4 and 6.)

The Plaintiff, Christy L. Cordell (hereinafter referred to as "Claimant"), filed applications

for DIB and SSI on February 26, 2004 (protective filing date), alleging disability as of October 1,

2003, due to hiatal hernia, h-phloria, two ulcers forming, malignant blood pressure, diabetes,

degenerative disc disease, arthritis, vertigo (water behind ear drums), bond spurs, deep seeded

calluses, sinusitis, emphysema, pleurisy, shingles, headaches, nervousness, has had eleven hernia

surgeries with two mesh implants in lower abdomen. (Tr. at 99-101, 103, 116, 304, 305-07.) The

claim was denied initially and upon reconsideration. (Tr. at 81-83, 92-94, 308-09, 310-12.) On

October 25, 2004, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at

95.) The hearing was held on June 2, 2006, before the Honorable Richard L. Swartz. (Tr. at 39-78.) By decision dated August 24, 2006, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 14-25.) The ALJ's decision became the final decision of the Commissioner on October 13, 2006, when the Appeals Council denied Claimant's request for review. (Tr. at 6-9.) On October 30, 2006, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Doc. No. 1.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2004). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall

2

v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2004). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in

3

which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

4

rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date. (Tr. at 16.) Under the second inquiry, the ALJ found that Claimant suffered from hypertension; degenerative joint disease, lumbar spine; depressive disorder, and anxiety disorder, which were severe impairments. (Tr. at 16.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 17.) The ALJ then found that Claimant had a residual functional capacity for light work, as follows:

> [C]laimant is able to stand, sit and walk up to six hours each in an eight hour work day with normal breaks. She can lift and carry up to 20 pounds occasionally and 10 pounds frequently. She is limited to low stress work.

(Tr. at 18.) At step four, the ALJ found that Claimant retained the residual functional capacity to

5

perform her past relevant work as a stock clerk or a sewing machine operator. (Tr. at 22-23.) Alternatively, on the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a stock/inventory clerk, packer, assembler, and cashier, at the light level of exertion. (Tr. at 24.) On this basis, benefits were denied. (Tr. at 24-25.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on August 18, 1953, and was 52 years old at the time of the

administrative hearing. (Tr. at 23, 42-43, 99.) Claimant had a high school education. (Tr. at 23, 43,

121.) In the past, she worked as a customer service representative, housekeeper/housecleaner,

housekeeping supervisor, desk clerk, apartment rental manager, stock clerk, and sewing machine

operator. (Tr. at 22-23, 44-50, 70-71, 123-30.)

 The Medical Record

         The Court has reviewed all the evidence of record, including the medical evidence, and will

discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

         Claimant asserts that the Commissioner's decision is not supported by substantial evidence

because the ALJ erred in (1) rejecting the opinions of three medical sources that Claimant was

disabled, (2) not finding the residuals of Claimant's hernia surgery a severe impairment, and (3)

finding that Claimant was capable of performing jobs identified by the VE at step of the sequential

analysis. (Doc. No. 13 at 4-11.) The Commissioner asserts that these arguments are without merit

and that substantial evidence supports the ALJ's decision. (Doc. No. 16 at 8-15.)

Analysis.

**1. Medical Source Opinions.**

         Claimant first alleges that the ALJ erred in rejecting the opinions of Drs. Riaz, Qayyum, and

Kropac, and according considerable weight to the opinions of the state agency physicians, Drs. Hays

and Surrusco. (Doc. No. 13 at 4-7.) Citing Boswell v. Barnhart, Civil Action No. 1:02-00500 (S.D.

W.Va. Sept. 30, 2003), Claimant asserts that the ALJ improperly credited the opinions of the state

agency consultants, despite their having not reviewed neither the records of Drs. Riaz, Qayyum, and

Kropac, nor the detailed progress notes and hospital reports of Dr. Green, who performed the

majority of Claimant's hernia surgeries. (Id. at 6.)

The Commissioner asserts that the ultimate opinions of disability are reserved to the Commissioner. (Doc. No. 16 at 8.) The Commissioner further asserts that the ALJ appropriately rejected the opinions of Dr. Riaz because his diagnosis was based largely on Claimant's subjective complaints and recitation of medical history, and his opinions were inconsistent with Claimant's lack of any treatment from a mental health professional and his assessed GAF of 70. (Id. at 9-10.) Furthermore, the Commissioner asserts that as a psychiatrist, Dr. Riaz was not qualified to render opinions regarding Claimant's physical condition. Regarding Dr. Qayyum, the Commissioner asserts that he "reported no objective findings that could reasonably lead to a conclusion of disability." (Id. at 10.) The Commissioner further asserts that the employment limitations identified by Dr. Qayyum, including bending, walking, and lifting, were accommodated by the ALJ in his RFC assessment of Claimant. (Id.) Finally, the Commissioner asserts that Dr. Kropac's opinion of disability was based essentially on Claimant's subjective reports, and therefore, was appropriately accorded no weight by the ALJ. (Id. at 11.) Furthermore, the Commissioner asserts that Dr. Kropac's objective findings do not support his opinion that Claimant was disabled, and that as an orthopedist specialist, he was not qualified to render an opinion regarding Claimant's mental impairments. (Id.)

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d), 416.927(d). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency (5) specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§

8

404.1527(d)(2), 416.927(d)(2).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527, 416.927. These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§

404.1527(d)(2), 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2)  provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given.  Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4), and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

### A. *Dr. Riaz.*

The record discloses that Riaz Uddin Riaz, M.D., a Board Certified Psychiatrist, performed a psychiatric evaluation of Claimant on November 7, 2005. (Tr. at 21, 236-39.) Claimant reported to Dr. Riaz that she suffered panic attacks, was nervous and depressed, was easily upset and cried, preferred to be left alone, and experienced seven or eight anxiety attack per week. (Tr. at 21, 236.) Dr. Riaz observed that she had moderate psychomotor retardation, appeared depressed and anxious, wrung her hands during the evaluation, and used a cane. (Tr. at 21, 237.) He noted her daily activities to include performing self-care with minimal assistance, watching television, and driving on occasion. (Tr. at 21, 237-38.) On mental status exam, Claimant was depressed, anxious, and

nervous; had difficulty relating to Dr. Riaz; had a depressed and anxious mood, with a constricted affect; exhibited non-spontaneous speech; expressed feelings of worthlessness, hopelessness, and uselessness; reported thoughts of suicide "off and on," but had no active plan; reported no auditory or visual hallucinations; and reported that she felt that "people are against her." (Tr. at 21, 238.) Claimant, who was oriented fully, presented with difficulty in abstract thinking, fair recent memory, good remote memory, poor attention and concentration, and good judgment and insight. (Id.) Dr. Riaz diagnosed Major Depressive Disorder, severe; Generalized Anxiety Disorder, moderately severe; and Panic Disorder, but assessed a GAF of 70. (Tr. at 21, 238.) He opined that her prognosis was poor and that Claimant has "a combination of emotional and physical problems that render her incapable of gainful employment." He further opined that Claimant "would be unable to interact appropriately with co-workers and supervisors. She would be unable to perform routine repetitive tasks at a sustained level. She would not be a suitable candidate for vocational rehabilitation." (Id.) He recommended that she be referred to a local mental health facility and noted that she was capable of managing her own benefits. (Tr. at 239.)

The ALJ summarized and evaluated Dr. Riaz's opinion and concluded that his "medical opinion is not accepted as credible in contravention to his own GAF rating and because he is not in a position to assess her physical impairments as he is a psychiatrist and conducted a psychiatric evaluation - not a physical examination." (Tr. at 21.) As stated above, Dr. Riaz assessed a GAF of 70. The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 61-70 indicates that the person has some mild symptoms or "some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful

interpersonal relationships." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994). The ALJ properly determined that Dr. Riaz's opinion of disability was inconsistent with his assessed GAF. The ALJ also properly rejected his opinion of disability Dr. Riaz regarding Claimant's physical because as a psychiatrist, he was not qualified to render an opinion regarding Claimant's physical condition. See 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5) (2006) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Furthermore, as the Commissioner asserts, Dr. Riaz's diagnoses and opinions were rendered essentially on the basis of Claimant's subjective reports and recitation of her background and medical history.

### B. Dr. Qayyum.

The record further discloses the treatment records of Rehan Qayyum, M.D., from July 6, 2005, through January 4, 2006. (Tr. at 242-47, 261-64.) On July 6, 2005, Claimant was seen on follow-up exam for her low back pain and occasional spasm. (Tr. at 21, 246.) On exam, she exhibited mild tenderness in the paraspinal muscles and Dr. Qayyum continued her on Naproxen 500mg and prescribed Flexeril 10mg. (Id.) On September 19, 2005, Dr. Qayyum noted a diagnosis of low back pain with intermittent exacerbations and opined that Claimant's condition was expected to last "probably forever [with] intermittent remissions [and] exacerbations." (Tr. at 21, 243.) He limited her from bending, lifting weights, and walking long distances. (Id.) On October 5, 2005, Claimant reported that she had been feeling fine. (Tr. at 21, 261.) She presented with mild bilateral wheezing, but had a normal exam in all other respects. (Id.) Dr. Qayyum diagnosed hypertension, low back pain, hyperlipidemia, insomnia, chronic obstructive pulmonary disease ("COPD"), and

depression. (Id.) On October 26, 2005, Dr. Qayyum administered a Kenalog 40mg injection to Claimant's right hip and a Toradol 60mg injection to her left hip. (Tr. at 21, 262.) At that time, Claimant also complained of headaches in the back of her head for the past two weeks. (Id.) Claimant was examined again by Dr. Qayyum on January 4, 2006, at which time he refilled her medications. (Tr. at 21, 263.)

The ALJ summarized and evaluated the opinion and treatment notes of Dr. Qayyum and rejected his medical opinion "as he submitted no objective tests or credible clinical findings to support his opinion." (Tr. at 21-22.) The ALJ noted that a MRI scan of Claimant's lumbar spine on January 12, 2003, revealed only mild degenerative disc disease at L5-S1, and that x-rays on November 7, 2005, revealed only mild to moderate degenerative changes. (Tr. at 21-22, 240, 247-48.) Based on these objective diagnostic studies, the ALJ determined that Dr. Qayyum's opinion of disability was "in contravention to the mild MRI scan results." (Tr. at 22.) Furthermore, the ALJ noted that Claimant was not compliant completely with Dr. Qayyum's prescribed treatment as he had to encourage her to take her blood pressure medication regularly. (Tr. at 22, 263.) The Court finds that despite Dr. Qayyum's treatment of Claimant on five occasions, the ALJ's reasons for discounting his opinion is supported by substantial evidence. Additionally, the Court notes that to the extent that Dr. Qayyum assessed limitations of Claimant's residual functional capacity ("RFC"), the ALJ accommodated those limitations of bending, lifting, and walking in his assessment of Claimant's RFC.

**C. *Dr. Kropac*.**

Finally, the record discloses the social security disability evaluation of Dr. Robert P. Kropac,

M.D., on March 20, 2006. (Tr. at 265-72.) Claimant presented with complaints of low back pain, with lower extremity radiation of pain, numbness of the left leg, and neck pain. (Tr. at 22, 267.) She reported a long history of neck and back pain, which had been treated with medication for control of symptoms. (Id.) Regarding her neck pain, Claimant reported that the pain was constant and increased with the use of her upper extremities. (Id.) She complained of numbness and tingling of both hands. (Id.) Regarding her back pain, Claimant reported that the pain was constant and aggravated by bending, stooping, twisting, sitting, and standing. (Id.) She complained of lower extremity radiation of pain and off and on right lower extremity radiation of pain when her lower back pain was at its worst. (Id.)

On physical exam, Claimant exhibited no evidence of significant scoliosis, tenderness to palpation over the posterior spinous processes, interspinous ligaments of the mid and lower cervical spine, and over the right and left related paraspinal muscle masses adjacent to these levels of the cervical spine. (Tr. at 22, 269.) She had limited cervical spine range of motion, but normal deep tendon reflexes, sensation, and strength. (Id.) She had a positive Tinel's sign, but full range of motion of the upper extremities. (Id.) Claimant further had limited lumbosacral range of motion and slight tenderness to palpation of her knees. (Tr. at 22, 270.) Claimant was able to heel and toe walk without weakness, though her gait was antalgic in nature, with a shortened stance phase on weight bearing of the left lower extremity. (Tr. at 22, 271.) She was not able to squat secondary to increasing knee and lower back pain. (Id.) Dr. Kropac diagnosed cervicodorsal musculoligamentous strain; lumbosacral musculoligamentous strain, superimposed on degenerative arthritis; carpal tunnel syndrome bilaterally; patellofemoral chondromalacia left knee; major depressive disorder; panic disorder; COPD; vertigo; and acid reflux. (Tr. at 22, 272.) Based on Claimant's history,

14

examination, and his review of her medical records, Dr. Kropac opined that "based on her age, education, and work experience [Claimant is] not capable of gainful employment and should be considered for permanent total disability through social security." (Id.) Claimant's x-rays of her lumbar spine on May 8, 2006, demonstrate mild to moderate degenerative spur formation but unremarkable disc space height and alignment. (Tr. at 22, 265-66.)

The ALJ summarized and evaluated Dr. Kropac's evaluation, as well as the May 8, 2006, x-rays, and concluded that Dr. Kropac's opinion was "not supported by his own physical examination findings." (Tr. at 22.) The Court finds that the ALJ"s decision is supported by substantial evidence.  Dr. Kropac's findings revealed nothing more than some limitation of motion and tenderness, with carpal tunnel syndrome. His findings do not suggest that Claimant was physically disabled. Furthermore, as stated above, the ALJ properly determined that as an orthopedic specialist, he was not qualified to render an opinion regarding Claimant's mental impairments.

### D. *State Agency Assessments.*

Finally, Claimant alleges that the ALJ improperly accorded considerable weight to the opinions of the state agency medical consultant, Dr. Randall Hays. (Doc. No. 13 at 6-7.) She contends that because Dr. Hays did not review the medical records of Drs. Riaz, Qayyum, and Kropac, his opinions are not supported by substantial evidence of record. (Id.) The record discloses that on April 30, 2004, Randall Hays, M.D., completed a form Physical Residual Functional Capacity Assessment of Claimant, which was affirmed by Richard M. Surrosco, M.D., on August 26, 2004. (Tr. at 21, 223-30.) Drs. Hays and Surrosco opined that despite Claimant's hiatal hernia, hypertension, COPD, and degenerative disc disease, she was capable of performing work at the light level of exertion, with occasional limitations of climbing ladders, ropes, and scaffolds; kneeling;

15

crouching; and crawling; and frequent limitations of climbing ramps and stairs, balancing, and stooping. (Tr. at 224-25.) They further opined that Claimant should avoid all exposure to fumes, odors, dusts, gases, and poor ventilation; and even moderate exposure to hazards, including machinery and heights. (Tr. at 21, 227.) They do not identify the specific medical records which they reviewed in formulating their opinions.

The ALJ summarized and evaluated the assessment of Drs. Hays and Surrosco and determined that it was "well supported by the overall evidentiary record and entitled to considerable weight." (Tr. at 21.) It is clear from the record that the assessment of Drs. Hays and Surrosco was completed prior to the dates of the opinions of Drs. Riaz, Qayyum, and Kropac. However, as stated above, the ALJ determined that each of these three opinions were unsupported by their own findings on exam. Therefore, the ALJ's reliance on the state agency assessment, which was rendered in the absence of the latter three opinions, was proper and supported by substantial evidence of record. Accordingly, the Court finds that Claimant's challenges to the ALJ's assignment of weight to the various opinions and assessments of records are without merit.

## 2. Residuals of Hernia Surgeries.

Claimant next alleges that the ALJ erred in not finding that the residual effects of Claimant's hernia surgeries constituted a severe impairment. (Doc. No. 13 at 7-9.) Claimant asserts that the ALJ inadequately evaluated the evidence regarding her hernias for two reasons. First, she asserts that he misstated the evidence when he found that Claimant had a number of abdominal hernia surgeries between February, 1995, and June 3, 1996, when in fact, she had at least six such surgeries. (Id. at 8.) Second, Claimant asserts that the ALJ erred in finding that the more recent medical reports did not demonstrate significant symptoms regarding Claimant's abdominal wall. (Id.)

16

The Commissioner asserts that though the ALJ stated at the administrative hearing that more recent reports regarding Claimant's hernias may be material, the only records submitted following the hearing dated back to the period from 1995 to 1996, which was years before Claimant applied for disability. (Doc. No. 16 at 12.) The Commissioner notes that Claimant underwent two or three procedure in 1995 and 1996, and that she was found "fully recovered" and able to return to work in July, 1996. (Id.) Though Claimant now asserts that a more recent report of August 21, 2003, documents Claimant's ten hernia surgeries, the Commissioner asserts that the report "pertained to an endoscopy procedure for a hiatal hernia, which had little or nothing to do with Plaintiff's lifting limitations." (Id.) The only "indication of an extensive abdominal hernia history was, again, Plaintiff's subjective statements given in her self-reported medical history." (Id. at 13.) Nevertheless, to the extent that any such hernias resulted in lifting limitations, the ALJ accommodated them when he limited him to light work. (Id.)

To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe. 20 C.F.R. §§ 404.1520(c); 416.920(c) (2004)." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2004); see also 20 C.F.R. §§ 404.1521(a); 416.921(a) (2004); Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987) (recognizing change in severity standard). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b); 416.921(b) (2004). Examples of basic work activities under those sections are:

> (1)Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2)Capacities for seeing, hearing, and speaking;
> (3)Understanding, carrying out, and remembering simple instructions;
> (4)Use of judgment;
> (5)Responding appropriately to supervision, co-workers and usual work situations; and

(6)Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b); 416.921(b) (2004).

The medical record discloses that Claimant underwent umbilical hernia repair with mesh on February 27, 1995, by T. C. Greene, M.D., in Bristol, Tennessee. (Tr. at 281-82, 288.) On April 19, 1995, Dr. Greene released her to return to work. (Tr. at 277.) Subsequent thereto, Claimant developed possible umbilical hernia repair infection and questionable mental status changes secondary to possible septicemia. (Tr. at 288.) On May 25, 1995, Dr. Greene performed surgery on Claimant to remove the abdominal wall mesh. (Tr. at 290-91.) Dr. Greene noted on October 13, 1995, that Claimant's wound had healed but that she was left with a deep scar with fixation of the fascia to her abdominal wall, which caused considerable localized discomfort. (Tr. at 279.) He felt that her symptoms would be relieved by releasing the scar from the abdominal fascia fixation through Short Stay. (Id.) Claimant underwent this release procedure on October 20, 1995. (Id.) However, on December 13, 1995, Claimant complained of right lower abdominal wall numbness and stinging. (Id.) On June 3, 1996, Claimant returned to Dr. Greene with an incarcerated incisional hernia, which Dr. Greene repaired on that date. (Tr. at 280, 292-98.) Dr. Greene noted that she was fully recovered on July 15, 1996, and released her to return to work as of July 16, 1996. (Tr. at 280)

On August 18, 2003, Claimant presented to St. Luke's Hospital with complaints of upper abdominal pain and reflux symptoms. (Tr. at 181-82.) She reported that she had approximately ten hernial surgeries in the past. (Tr. at 181.) On August 21, 2003, Claimant underwent an esophagogastroduodenoscopy with biopsy of the gastroesophageal junction and CT Otest evaluation by M. Kuppusami, M.D. (Tr. at 178-79.) Post-operative diagnoses included hiatal hernia and duodenitis. (Tr. at 178.) The procedure was indicated on Claimant's reflux symptoms, chest pain and

abdominal pain with negative cardiac evaluation, to rule out reflux condition. (Tr. at 178-80)

The ALJ noted in his decision Claimant's testimony that she had eleven hernia surgeries and that she had to wait ten months for special mesh due to an allergic reaction to that placed along her abdominal wall. (Tr. at 19, 53, 64-65.) He further acknowledged her report that Dr. Greene limited her to lifting five pounds. (Tr. at 19, 65.) The ALJ did not find that Claimant's history of hernias constituted a severe impairment. The Court agrees. There is neither any indication in the record that Dr. Greene has continued his lifting limitations of five pounds, nor that Claimant has continued to suffer residuals from the hernia repairs, with the exception of the August, 2003, hiatal hernia surgery. The records regarding the bulk of Claimant's surgeries precede her onset of disability date and she has not identified specifically any significant limitations resulting from these repairs. In assessing Claimant's RFC, the ALJ limited Claimant to lifting twenty pounds occasionally and ten pounds frequently. (Tr. at 18.) Accordingly, the Court finds Claimant's allegation that the residuals of her hernia surgeries constituted a severe impairment, is without merit.

**3. Vocational Evidence.**

Finally, Claimant alleges that the ALJ inadequately evaluated the vocational evidence at steps four and five of the sequential analysis. (Doc. No. 13 at 9-11.) First, Claimant contends that she testified that she had used a cane for three years, as was prescribed by Dr. Qayyum, and that the VE testified that Claimant could not perform any of the jobs identified if she needed to use consistently a cane. (Id. at 10.) Consequently, Claimant is not able to perform the jobs of stock clerk and sewing machine operator. The Commissioner asserts that there is nothing in the objective medical records to indicate that Claimant was prescribed a cane. (Doc. No. 16 at 13.)

The Court agrees with the Commissioner and finds that the medical evidence of record does

not demonstrate that Claimant was medically prescribed a cane. At the administrative hearing, Claimant testified that she used a cane, as prescribed by Dr. Qayyum for stability due to her left kneecap constantly dislocating. (Tr. at 60.) She testified that she used the cane the entire day. (Tr. at 76.) However, as noted above, Claimant was capable to heel and toe walking, though Dr. Kropac noted that her gait was somewhat antalgic. Furthermore, Dr. Qayyum's medical notes do not reference his prescribing of the use of a cane and indicate that Claimant was limited only from walking long distances. Accordingly, the ALJ properly relied on the VE's testimony regarding the use of a cane.

Next, Claimant alleges that Dr. Kropac diagnosed bilateral carpal tunnel syndrome and cervicodorsal musculoligamentous strain, which eliminates the jobs identified by the VE, as they required good use of both upper extremities. (Doc. No. 13 at 10.) The Commissioner asserts that the medical evidence does not support Claimant's allegations of extreme functional limitations due to these conditions. (Doc. No. 16 at 14.) As discussed above, Dr. Kropac diagnosed these conditions. However, the ALJ concluded that despite Dr. Kropac's opinion to the contrary, Claimant was not disabled as a result of his impairments due to the inconsistency between Dr. Kropac's opinion and his findings. As summarized above, though Dr. Kropac noted that Claimant had a positive Tinel's sign, on exam she presented with full range of motion of her upper extremities and normal muscle strength. Dr. Kropac's diagnosis alone is not sufficient to warrant a finding of disability. As Claimant notes, the VE testified that all the jobs identified, with the exception of a cashier, require the use of both hands and a certain degree of cervical flexion. (Tr. at 76.) However, the record does not demonstrate that Claimant's conditions resulted in significant limitations or precluded Claimant from performing the jobs identified by the VE. Accordingly, Claimant's argument on this issue is

20

without merit.

Claimant further alleges that Dr. Qayyum prohibited Claimant from lifting weights due to her multiple hernia surgeries, but the VE testified that the stock or inventory clerk jobs would require her to lift twenty pounds, despite the occasional limitation in the description of light work. (Doc. No. 13 at 11.) As discussed above, the record lacks sufficient evidence to support Claimant's allegations of multiple hernia surgeries and Dr. Green's five pound lifting limitation. Though Dr. Qayyum indicated that Claimant was limited from lifting weights, there is nothing in the record to suggest that she could not perform all the exertional requirements of light work. The ALJ discounted Dr. Qayyum's opinion for the reasons stated above. Furthermore, the ALJ identified the job of a sewing machine operator, in addition to the stock or inventory clerk jobs, which Claimant was capable of performing. Therefore, Claimant's argument on this point is without merit.

Finally, Claimant alleges that the ALJ failed to consider Claimant's testimony that she was required to undergo nebulizer treatments four times a day, for fifteen minutes each treatment, and the VE's testimony that if Claimant was unable to take these treatments on a regular break, then the treatments would be too disruptive to employment. (Doc. No. 13 at 11.) The Commissioner asserts that "there is noting in the objective evidence of record to support Plaintiff's claims that must interrupt her daily work schedule for nebulizer treatments." (Doc. No. 16 at 15.) The Court agrees with the Commissioner. Though Claimant was advised to take nebulizer treatments four times each day, for fifteen minutes in duration each treatment, the objective medical record does not indicate that such treatments had to be taken during the workday or during a work break. Accordingly, the Court finds Claimant's argument on this issue to be without merit and the ALJ's reliance on the VE's testimony is supported by substantial evidence of record.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Doc. No. 13.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Doc. No. 16.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: March 31, 2008.

R. Clarke VanDervort
United States Magistrate Judge

22